Max A. BURDE and Berthe C. Burde, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Bernard WEISS and Peggy S. Weiss, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 65, 66, Docket 29623, 29624.

United States Court of Appeals Second Circuit.

Argued Sept. 28, 1965.

Decided Nov. 5, 1965.

Burde and Bernard Weiss ("husbands," "taxpayers") on account of a 1955 transfer of their respective one-third interests in a bath oil formula to a partnership in which Berthe C. Burde and Peggy S. Weiss ("wives") each had a one-third interest, are properly taxable as ordinary income or as long term capital gains. The Tax Court, *per* Judge Fay, determined that the payments were ordinary income and upheld the Commissioner's assessment of deficiencies against Max Burde and Bernard Weiss, respectively, of $7,215.48 and $7,093.14 (the wives are parties only because both couples filed joint returns). See 43 T.C. 252 (1964). We affirm, but we disagree with one of the alternative grounds relied on below —that a partnership can never be treated as an entity for purposes of Section 1235. Because this is a question of first impression at the appellate level, we feel compelled to state our views in more detail than would otherwise be warranted.

## I.

The facts are undisputed and since they were fully set forth in the Tax Court opinion, we will make only brief reference to them. Since 1940, the husbands have been partners engaged in the business of wholesaling drugs, cosmetics, and toiletries. In April 1954, Martin F. Emory sought to interest them in a bath oil formula, which he had conceived but had not begun to develop. The husbands accepted his proposal to transfer to each of them a one-third interest in the formula, in return for which they would finance all of the development costs, estimated at $12,000. It was contemplated from the outset of the venture that the formula would be sold to a large cosmetic manufacturer as soon as it was proven commercially practicable. The husbands engaged a chemist to test the formula and personally sampled the product. Together with Emory, they participated in conferences with patent attorneys concerning the relative merits of patenting the formula or retaining it as a trade secret. A patent application was filed

Robert J. Wolpert, of Steingarten, Wedeen & Weiss, New York City (Albert A. Wedeen, New York City, on the brief), for petitioners.

Jonathan S. Cohen, Attorney, Department of Justice, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before FRIENDLY and KAUFMAN, Circuit Judges, and BRYAN, District Judge.*

KAUFMAN, Circuit Judge:

This appeal raises novel and interesting questions involving the interrelationship between Sections 1235 and 707 of the Internal Revenue Code of 1954. The sole issue is whether payments of $19,484.33, received severally in 1958 by Max A.

---

* Of the Southern District of New York, sitting by designation.

in February 1955, and the patent was subsequently granted in 1963.

On January 2, 1955, Emory met with the husbands and wives and suggested that instead of selling the formula to a large manufacturing concern, as originally contemplated, it would be wiser to produce and market it themselves. The husbands declined this proposal, but the wives, who had substantial experience in the cosmetics industry, were enthusiastic about the idea. As a result, the husbands acquiesced in an informal agreement whereby they and Emory would transfer their interests in the formula to a new manufacturing partnership known as "Sardo by Sardeau," in which Emory and the wives would each have a one-third interest, in return for a royalty to be established when production costs were ascertained. It was further agreed that the husbands' wholesaling partnership, Keystone Company, would undertake to solicit orders for the bath oil on a commission basis. Thereafter, Sardo by Sardeau produced the first large commercial batch of the formula, which bore the trade name "Sardo," and Keystone soon obtained orders for the oil from a large department store. On May 31, 1955, Emory and the husbands formally executed an agreement transferring Sardo to the partnership Sardo by Sardeau, in return for a flat payment of $2,500.00 plus 6 per cent of the net sales commencing January 1, 1956. The product rapidly caught the public's fancy, as evidenced by the 1955 net sales totaling $342,244.46. On January 2, 1956, Emory and the wives resuscitated a dormant corporation ("Sardeau, Inc."), transferred to it the assets and liabilities of Sardo by Sardeau, and extinguished the partnership.[1] The corporation took over the royalty payments to Emory and the husbands, and in 1958, the year in issue, each of the three men received $19,484.33. For purposes of this case, we can ignore the incorporation of the partnership and treat the royalties as if received directly from the partnership.

## II.

Section 1235 provides, in essence, that a transfer of all substantial rights in a patent, or an undivided interest therein, by a holder, to transferees other than related persons, shall be treated as if it were a sale or exchange of a capital asset held for more than six months, without regard to whether the payments received in consideration for the transfer take the form of royalties on a license.[2] Sec-

---

1. In 1947, Emory and the husbands had acquired all the stock in Sardeau, Inc., which was engaged in wholesaling luxury perfumes. The venture proved unsuccessful, and in 1953 the husbands discontinued their association with the corporation. The assets were transferred to a partnership composed of Emory and the wives, who carried on the business. The corporation continued in existence as a hollow shell until it was revived to take over the production of Sardo. After the January 2, 1956 transaction, the stock was owned 90 per cent by Emory and the wives, and 10 per cent by one Herbert Greenwald.

2. § 1235. *Sale or exchange of patents*

(a) *General.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of wheth-

er or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or *disposition* of *the property trans-ferred*.

(b) *"Holder"* defined.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

(c) *Effective date.*—This section shall be applicable with regard to any amounts

tion 1235 is to be disregarded in assessing the tax consequences of a transaction not falling within its ambit, and the tax consequences are to be determined by other provisions of the Code. Treas. Reg. § 1.1235–1(b). The taxpayers do not contest on appeal that if the May 1955 transfer to the manufacturing partnership fails to qualify under Section 1235, the royalties they received are ineligible for taxation at long term capital gain rates.[3]

◼ The Commissioner does not dispute that Emory and the husbands were "holders" who transferred all substantial rights in Sardo to the manufacturing partnership.[4] He contends, rather, that Section 1235 is inapplicable because Sardo was transferred to related persons within the meaning of Section 1235(d). This subsection incorporates the definition of related persons contained in Section 267(b) (with minor modifications not relevant here). In not uncommon reticulate tax law fashion, Section 267 (b) (1) refers us to Section 267(c) (4), where we at last find the hardly startling revelation that a spouse is a related person.

◼ The taxpayers urge that Sardo was transferred to a partnership, and since Section 267(b) does not define a partnership as a related person, Section 1235(d) has no application to this case. The Commissioner counters with the interesting suggestion that the partnership entity must be disregarded for purposes of Section 1235. Therefore, he argues, the transfer must be deemed to be directly from Emory and the husbands to Emory and the wives.

The Tax Court opinion evidenced full agreement with the Commissioner. As support for this position, however, it relied heavily on Treas.Reg. § 1.1235–2 (d) (2), which provides that a partnership cannot be the *holder* of a patent, but that the individuals comprising the partnership may qualify as co-holders to the extent of their partnership interests. We believe that reliance on this Regulation is misplaced. It is of course true that a partnership cannot be the *holder* of a patent; Section 1235(b) expressly defines a *holder* as an *individual* who either invented the *res* of the patent or purchased an interest in it before it was reduced to actual practice. But a *transferee* of an invention which has been reduced to actual practice (see note 3, supra) can never be a holder, Section 1235 (b). Therefore, it would seem to us that

received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

(d) *Related persons.*—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b); except that, in applying section 267(b) and (c) for purposes of this section—

(1) the phrase "25 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in section 267(b), and

(2) paragraph (4) of section 267(c) shall be treated as providing that the family of an individual shall include only his spouse, ancestors, and lineal descendants. As amended Sept. 2, 1958, Pub.L. 85–866, Title I, § 54(a), 72 Stat. 1644.

3. A property right in an original invention comes into existence for tax purposes

when the invention is reduced to actual practice. Samuel E. Diescher, 36 B.T.A. 732 (1937), aff'd, 110 F.2d 90 (3d Cir.), cert. denied, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415 (1940); see Treas.Reg. § 1.1235–2(e). Sardo became commercially practicable in January 1955, less than six months before it was transferred to the manufacturing partnership. Therefore, even if it be assumed *arguendo* that Sardo was a capital asset in the hands of Emory and the husbands, if Section 1235 is not applicable, the transfer gave rise to short term capital gain, taxable at ordinary income rates. See 43 T.C. at 268.

4. It should be noted that although Section 1235 by its terms refers to the transfer of patents, the invention need not be patented nor a patent application filed at the time of the transfer for the section to be applicable, so long as the invention is patentable. Treas.Reg. § 1.1235–2(a); See F. H. Philbrick, 27 T.C. 346, 356 (1956).

the Regulation interpreting the statutory definition of *holder* has no relevance to a transferee partnership, and that nothing in Section 1235 itself precludes treating the partnership as an entity.

■ Section 1235(d) was drafted expressly to prevent the conversion of ordinary income into capital gains by a transfer of a patent within essentially the same economic group. See H.Rep. No. 1337, 83d Cong., 2d Sess. A280–A281 (1954), U.S.Code Congressional and Administrative News, p. 4025. We are, therefore, not persuaded by the taxpayers' argument that the silence of Section 267(b) on the subject of partnerships signifies a Congressional intent that a transfer to a partnership can never fall within the ambit of Section 1235(d). It is far more likely that Congress never considered the question.[5] When Congress in 1954 enacted Section 707, permitting a partnership to be treated as an entity in the circumstances we shall discuss, it recognized the impossible task of foreseeing all the instances in which resourceful taxpayers might urge that a partnership was deserving of entity treatment.

No inference is intended, however, that a partnership is to be considered as a separate entity for the purpose of applying other provisions of the internal revenue laws [than § 707]

if the concept of the partnership as a collection of individuals is more appropriate for such provisions. H. Conf.Rep. No. 2543, 83d Cong., 2d Sess. 59 (1954), U.S. Code Congressional and Administrative News, p. 5319.

We do not agree with the Commissioner, however, that it is necessary in all Section 1235 cases to "pierce the partnership veil." If this were the rule, then the transfer of a wholly owned patent to a partnership in which the transferor (or a related person) owned but a small interest would fail to qualify for capital gains rates to the extent of the transferor's partnership interest, in spite of the fact that the patent was no longer controlled within essentially the same economic group. This result was rejected in Weller v. Brownell, 240 F.Supp. 201, 208–210 (M.D.Pa.1965), where the transferor-inventor and related persons owned 44.90 per cent of the transferee partnership.

Our task of interpretation and reasoned elaboration cannot be adequately performed if we examine each section as if it existed in a vacuum. We have already discussed the manner in which various sections of the Internal Revenue Code intermesh. It is our conclusion, therefore, that the test employed in Section 707[6] to determine when a partner-

---

5. Section 267(b) (2), as modified by the 1958 amendment of Section 1235(d), includes within the definition of related persons a corporation more than 25 per cent owned (actually or constructively) by an individual. A corporation, thus, cannot be used as the vehicle to consummate the interdicted conversion of ordinary income to capital gains via a sale of patents within the same economic group. There is no reason to suppose that Congress necessarily would have treated corporations and partnerships alike. Compare §§ 351 and 368(c) with § 707(b) (2) (A). But *it is doubtful* that Congress, had it foreseen the problem, would have left the door to the partnership vehicle completely unlocked.

6. § 707. *Transactions between partner and partnership*

(a) *Partner not acting in capacity as partner.*—If a partner engages in a trans-

action with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

(b) *Certain sales or exchanges of property with respect to controlled partnerships.*—

(1) *Losses disallowed.*—No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between—

(A) a partnership and a partner owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or

(B) two partnerships in which the same persons own, directly or indirect-

ship may be treated as an entity for purposes of that section is highly relevant and informative, if not controlling, in an analysis of the same question arising under Section 1235.

Section 707(a) is an elective provision. Except in those "controlled partnership" situations otherwise provided in Section 707(b), a partner may deal with a partnership of which he is a member other than in his capacity as partner. Thus, for illustration purposes, if a partner transfers to a partnership a depreciable capital asset worth 30, having a basis in his hands of 10, he can elect to deal with the partnership as a separate entity. He would then recognize an immediate capital gain of 20, and the partnership would be able to take a depreciation deduction against ordinary income of 30 (over the useful life of the asset). If the partnership were not eligible for separate entity treatment, no gain would be recognized on the transfer (§ 721); the partnership would take a basis of 10 for the asset, carried over from the basis of the asset in the transferor's hands (§ 723); and the partnership could only take 10 in depreciation as an offset against ordinary income. A fortiori if a partner were permitted to treat a partnership wholly owned by himself and related persons as a separate entity, he would be able to effect a conversion of ordinary income into capital gains even though the transferred asset remained in the control of the same economic group. Section 707(b)(2) was drafted to prevent this abuse. See S.Rep. No. 1622, 83d Cong., 2d Sess. 94 (1954) U.S.Code Congressional and Administrative News, p. 4629. A controlled partnership (as defined therein) cannot be treated as a separate entity for purposes of Section 707. It seems logical and consistent to us that the Section 707(b)(2) tests, which are designed to accomplish the same objective as Section 1235(d), should be employed as an aid in determining whether a partnership may be treated as an entity for purposes of this subsection. See Weller v. Brownell, supra. We are not to be understood as saying that in order to merit capital gains treatment, the taxpayer must necessarily satisfy *both* Sections 707 and 1235. Rather, we are suggesting that in determining whether a transaction qualifies under Section 1235, it is appropriate to examine whether it filters through the Section 707 sieve.

It has been suggested that Section 707 (b)(2) is badly drafted, and that the loophole created by it should not be imported into Section 1235. Section 707 (b)(2)(A) precludes capital gain treatment for a transfer by a single partner

---

ly, more than 50 percent of the capital interests or profits interests. In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1).

(2) *Gains treated as ordinary income.*—In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221—

(A) between a partnership and a partner owning, directly or indirectly more than 80 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of the capital interests or profits interests,

any gain recognized shall be considered as gain from the sale or exchange of property other than a capital asset.

(3) *Ownership of a capital or profits interest.*—For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section.

(c) *Guaranteed payments.*—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162 (a) (relating to trade or business expenses).

and related persons who own more than 80 per cent of the transferee partnership interest. Section 707(b) (2) (B) mandates the same result for a transfer between two partnerships under 80 per cent common ownership. But, unlike Sections 351 and 368(c), which deal with transfers to a controlled corporation, there is no provision in Section 707(b) (2) relating to a transfer by individuals who as a group own most of the transferee partnership interests, although no single individual and related persons own more than 80 per cent. Therefore, it is argued that if two unrelated individuals each own a depreciable capital asset worth 30 with a basis in their hands of 10, and both simultaneously transfer the assets to a partnership, each taking a one-half interest therein, the literal terms of the statute permit them to recognize gain at capital rates and step up the basis of the asset in the partnership's hands.

Nothing we have said here compels this result. It is always open to the Commissioner to assess deficiencies on the ground that regardless of regularity of form as a matter of plutological reality there was no substantial change in economic ownership. See Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed. 2d 128 (1960); Nassau Lens Co. v. Commissioner, 308 F.2d 39 (2d Cir. 1962).

Moreover, in the context of subdivision (a) of Section 1235, the Commissioner has specific statutory authority to block capital gains treatment unless "all substantial rights to a patent," are transferred. In this connection, George N. Soffron, 35 T.C. 787 (1961) held that a transfer of a patent owned in equal shares by four individuals to a partnership in which the individuals owned equal interests did not qualify under Section 1235(a) because there was no transfer of "all substantial rights." The Court stated: "to ascertain if this requirement has been satisfied it is often necessary

to cast aside the superficial indicia of the transfer and reach the core of the transaction to view its true economic realities." 35 T.C. at 789; see S.Rep.No. 1622, 83d Cong., 2d Sess. 439–40 (1954).

We do not understand the Commissioner to have contended that the transfer from Emory and the husbands to the manufacturing partnership composed of Emory and the wives was not a transfer of all substantial rights. He presumably not only accepted the bona fides of the disagreement between the husbands and wives as to whether Sardo should be sold to a large cosmetics manufacturer, but also determined that the husbands yielded all substantial rights to the patent in spite of the informal agreement that their wholly owned partnership, Keystone, would wholesale Sardo on commission.[7] In light of this, we need not consider the question.

### III.

■ We hold that the May 1955 transfer of Sardo falls within the literal terms of Section 707(b) (2) (B)—a transfer between two partnerships 80 per cent owned by the same or related interests. Accordingly, the transferee partnership may not be treated as an entity pursuant to Section 1235(d), and the royalty payments received in 1958 were properly taxable as ordinary income.

■ The taxpayers contend vigorously that Emory and the husbands were not partners, but mere co-owners. Otherwise, they concede that the conditions of Section 707(b) (2) (B) were present in the May 1955 transfer. A partnership is defined in Section 761 to include, *inter alia*, a joint venture.

> The term "partnership" is broader in scope than the common law meaning * * * Mere co-ownership of property which is maintained, kept in repair, and leased does not constitute a partnership. * * * Tenants in common, however, may be

---

7. Emory and the husbands subsequently formed a new partnership, "Emory As- sociates," which took over the wholesale operation from Keystone.

partners if they *actively carry on a trade, business, financial operation, or venture and divide the profits thereof.* Treas.Reg. § 1.761–1(a)(1) (emphasis added).

Whether a joint venture exists for tax purposes is not dependent on local law. Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1946).[8] Rather, the intent of the parties controls. Ibid.; Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949). This intent is not to be determined, contrary to the taxpayers' assertion, merely from testimonial protestations that no joint venture was intended. Preferably, the trier of fact is to ascertain the parties' intention by "considering all the facts—the agreement, the conduct of the parties in execution of its provisions * * * and any other facts throwing light on their true intent * * *" Commissioner of Internal Revenue v. Culbertson, supra, at 742, 69 S.Ct. at 1214.

> Whether the parties actually intended to become partners (or joint venturers) has long been treated as a question of fact and a finding as to such intention, if supported by competent evidence [and if the trier of fact applied the correct legal standard], is final. Cleveland v. Commissioner, 297 F.2d 169, 172 (4th Cir. 1961).

It is quite clear that the Tax Court applied the correct legal standard in concluding that a joint venture existed.[9] Although some of the factors often found relevant to the existence of a joint venture, such as joint bank accounts, filing of partnership returns, an agreement to share losses, are not present in this case, no single factor is controlling. Levin v. Commissioner, 199 F.2d 692, 694 (2d Cir. 1952); see Commissioner of Internal Revenue v. Tower, supra; J. Roland Brady, 25 T.C. 682 (1955).

The evidence adduced at trial plainly demonstrated that Emory and the husbands conducted an enterprise for profit. It was their intention to develop the formula until it was commercially practicable, sell it to a manufacturing concern, and divide the proceeds of sale into three equal parts. The husbands played a significant role in the development of the formula. When Emory first approached them, he possessed merely an untested formula. The metamorphosis to the finished product took place only after the husbands applied their energy and resources. They engaged a chemist to test samples of the formula, the first step in the evolution. They participated in recurrent conferences with patent attorneys throughout the last half of 1954. Finally, it was reasonable to infer that if the original plan of selling the formula to a large concern had been carried out, the husbands' extensive background in the cosmetics field would have been instrumental in negotiating the sale.

We do not suggest that all persons who finance the development of a patent are necessarily joint venturers with the inventor. We believe, however, that there was substantial evidence of the husbands' active participation supporting the Tax Court's factual determination. We decline to overturn this finding. See Cleveland v. Commissioner, supra.

Affirmed.

---

8. We do not necessarily imply that as a matter of state law, the participation of Emory and the husbands was insufficient to constitute a joint venture. See Wooten v. Marshall, 279 F.2d 558, 560 (2d Cir. 1960).

9. "In determining for tax purposes whether a particular relationship between persons constitutes a partnership, the intent of the parties is, in the final analysis, the controlling factor. Since intent is a subjective factor not readily discernible by a trier of fact, we are forced to rely upon the objective acts of Burde, Weiss, and Emory as evidence of their subjective intent." 43 T.C. at 265–266.

FRIENDLY, Circuit Judge (concurring in the result):

Section 1235 of the Internal Revenue Code of 1954 confers extraordinary income tax advantages on holders of patents. It accords long-term capital gain treatment to the transfer of patent rights even though the particular patent is not a "capital asset" and has not been held for the six months ordinarily required, and although a usual form of the transfer, with payment contingent on production or sale and extending over a long period, is not what many people—importantly including the Commissioner of Internal Revenue, Mim. 6490, 1950–1 Cum. Bull., 9–10—would regard as a "sale or exchange." Naturally Congress did not want these unusual advantages to be available when the transferor retained a large measure of economic benefit through ownership in the transferee. Least of all could it have wanted a husband, by means of even the best faith transfer of a patent to his wife, to eat, drink and be merry, at long-term capital gains rates, on what would have been taxable as ordinary income to him if the transfer had not occurred. To that end it inserted § 1235(d), expressly denying the special tax treatment to transfers to related persons.

The problem here stems from the method adopted by the draftsmen of § 1235(d) to exclude such transactions—a cross-reference to § 267(b) of the Code, which disallows deductions for losses incurred in transactions between the taxpayers therein specified. The particular difficulty lies in the incomplete definition of "related taxpayer" in § 267; though speaking at some length about relationships between natural persons, between them and corporations, and between corporations, the section says

nothing about relationships between natural persons and partnerships.

I heartily agree with my brothers in rejecting taxpayers' primary position that because of this omission a transfer of a patent to a partnership is immune from the § 1235(d) disqualification of transactions with related persons —a position which would mean, for example, that a professional inventor could obtain long-term capital gain treatment by granting an exclusive license on his patent to a partnership in which he had a 75%, or even a 90%, interest.[1] But I cannot agree with their rejection of the Commissioner's primary position, namely, that when long-term capital gain treatment under § 1235 is sought for a transfer to a partnership, the transaction must be tested by applying the provisions of § 267(b), the section of the Code mentioned in § 1235(d), to the natural persons who form the partnership, and not by those of § 707, which § 1235(d) ignores.

The legislative history of § 1235 indicates the deep concern of Congress that the special treatment for transfers of patent rights there accorded should not be available for "possible non-arm's-length transactions between related taxpayers." 1954 U.S.Code Cong. & Ad.News, pp. 4422–23. The exclusion of transfers between related persons was expressly intended to "prevent possible abuses arising from the sale of patents within essentially the same economic group." Ibid. To achieve this purpose, the related person limitation of § 1235(d) in the 1954 Code disqualified transfers to corporations when more than 50% of the stock was owned by the transferor; this was further tightened in 1958 to exclude transactions when the transferor held a 25% or greater interest in the corporation. 26

[1]. It might be argued that when the transferor's interest approaches total ownership of the transferee partnership, there has been no transfer of "all substantial rights" in the patent, and § 1235 is hence inapplicable, even though the transfer was not a sham. See Soffron v. C. I. R., 35 T.C. 787 (1961). But the "substantial rights" provision seems rather to have

been aimed against retention of legal rights in the patent transferred, see Treas.Reg. § 1.1235-2(b); 3B Mertens, Federal Income Taxation § 22.135 at 610–11 (1958), whereas Congress relied on § 1235(d) to deal with a transferor's economic interest in a transferee that had obtained substantially all such rights.

U.S.C. § 1235(d), as amended, 72 Stat. 1644 (1958).[2] Despite the absence of any similar mention of partnerships, mere statement creates serious question as to the good sense of a reading whereby a transfer to a partnership will qualify unless more than 80% is owned by the transferor, although retention of a 25% interest in a corporation would defeat the special § 1235 benefits. That no such anomaly was ever intended and that Congress, in omitting any reference to partnerships in § 1235, simply assumed that the partnership entity would be disregarded, becomes clear from the legislative history of § 707 and the rationale which was stated to underlie the liberal provisions of that section generally recognizing capital gains in transfers from individual partners to their own partnerships.

The House version of § 707, which contained the general rule that a partner who engages in a transaction with a partnership shall be treated as though he were an outsider, provided that no gain or loss should be recognized when the transferring partner had an interest of 50% or more in the capital or profits of the partnership—the same test employed in § 267(b) with respect to the allowance of losses in transfers to controlled corporations. 1954 U.S.Code Cong. & Ad. News pp. 4093–94, 4366–67. The Senate Finance Committee thought the proviso was "unduly harsh" because there was "little opportunity in this area to convert potential ordinary income into capital gains" and because much more lenient treatment was already available for similar transactions between stockholders and their corporations. It therefore substituted "the present provisions applicable in the case of corporations"—namely, that gains would be recognized save where the transferor owned in excess of 80% but losses would be recognized only if such interest did not exceed 50%. 1954 U. S. Code Cong. & Ad. News pp.

4726, 5028–29. The Senate provision was adopted by the Conference Committee, but the following express reservation was included in their report:

> Both the House provision and the Senate amendment provide for the use of the "entity" approach in the treatment of the transactions between a partner and a partnership which are described above. No inference is intended, however, that a partnership is to be considered as a separate entity for the purpose of applying other provisions of the internal revenue laws if the concept of the partnership as a collection of individuals is more appropriate for such provisions. 1954 U.S.Code Cong. & Ad.News pp. 5319–20.

The legislative history not only does not disclose an intention that any transfer of a patent to a partnership meeting the tests of § 1235(a) and (b) should qualify for long-term capital gain treatment unless it falls within the exception of § 707(b) (2), but strongly indicates that reference to that subsection as the test for relationship is unwarranted. The opportunity to convert ordinary income into capital gain, the absence of which was the express reason for the Senate's liberalizing the House version of § 707, is precisely what § 1235 creates; and treating the partnership as a collection of individuals is "appropriate" for fulfilling the purpose of § 1235(d) to prevent abuses from sales of patents within the same economic group. But there is much more than this. Since the stated philosophy of the broadened § 707 was that transfers to partnerships should receive the same treatment as transfers to corporations, it would be wholly inconsistent with the congressional purpose to utilize § 707 to give a transfer to a partnership a far more favorable posture under § 1235 than one to a corporation. The corporate analogue to § 707(b) (2)

2. Although the latter restriction is only applicable to transfers taking place after September 2, 1958, it indicates a strong legislative intention that the benefits of § 1235 be denied when the transferor holds a substantial interest in the transferee corporation.

is § 1239, which permits capital gains to be recognized unless the transferor owns more than 80%. Congress deliberately rejected that test in delimiting the transfers to a controlled corporation that would qualify for long-term capital gain treatment under § 1235; instead it imposed the more severe 50% test used in § 267 with respect to the allowance of losses, and subsequently it reduced the allowable percentage of control still further. It would be hard to find a more compelling basis for concluding that, in the application of § 1235, reliance on the entity concept of § 707 and use of § 707 (b) (2) as the standard for recognizing transfers to partnerships is not justified, and that disregard of the partnership entity would be "more appropriate," in the language of the Conference Report, to avoid especially favorable treatment for patent transfers between related persons. Cf. Rossmoore v. C. I. R., 76 F.2d 520, 521 (2 Cir. 1935). The taxpayers here necessarily concede that if this is the proper approach, the transfer does not qualify under § 1235, see §§ 267(b) (1) and (c) (4).

It is true that ignoring the partnership entity will not provide equality as between partnerships and corporations for transfers that qualify for long-term capital gain treatment only because of § 1235. From the standpoint of equality alone, the ideal solution might be—or before the 1958 amendment of § 1235(d) might have been—to apply the 50% test used in § 707(b) (1) in regard to the allowance of losses. But to do that would be taking greater liberties with the text than a court may permissibly do. When the only available choice is between applying the liberal 80% test of § 707(b) (2), which Congress manifestly did not intend in this context, and disregarding the entity concept, which Congress directed the Commissioner and the courts to do when "more appropriate," the answer can scarcely be in doubt. See United States v. American Trucking Ass'n, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); J. C. Penney Co. v. C. I. R., 312 F.2d 65, 68–69, 72–73 (2 Cir. 1962).