HARDIMAN, Circuit Judge.
 

 This appeal requires us to decide whether royalties paid on a technology license agreement should have been treated as ordinary income or as capital gains. The distinction is significant for taxpayers like the Appellant, Dr. Spiridon Spireas, who earned $40 million in such royalties over just two tax years. If those earnings were ordinary income, Spireas owed a 35 percent tax; if they were capital gains he owed 15 percent.
 

 Spireas claimed the favorable capital gains treatment pursuant to
 
 26 U.S.C. § 1235
 
 (a), which applies to money received "in consideration of" "[a] transfer ... of property consisting of all substantial rights
 to a patent." The Commissioner of Internal Revenue disagreed that Spireas was entitled to § 1235(a) treatment, finding that Spireas should have treated the royalties as ordinary income. Accordingly, the Commissioner gave Spireas notice of a $5.8 million deficiency for the 2007 and 2008 tax years. Spireas petitioned the Tax Court for a redetermination of the deficiency, but after a brief trial the Tax Court agreed with the Commissioner. Spireas appeals that final order.
 
 [1]
 

 I
 

 Royalties paid under a license agreement are usually taxed as ordinary income. An exception to this general rule is found in section 1235 of the Internal Revenue Code, which affords special treatment to payments earned from certain technology transfers. The statute provides that "[a] transfer ... of property consisting of all substantial rights to a patent ... by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year."
 
 26 U.S.C. § 1235
 
 (a). Payments made "in consideration of,"
 

 id.
 

 , transfers that meet the statutory criteria are taxed at a long-term capital gains rate that can be about half of that applicable to ordinary income.
 
 Compare
 

 26 U.S.C. § 1
 
 (a), (i)(2) (2008) (providing a top marginal rate of 35 percent for married taxpayers filing jointly),
 
 with
 

 26 U.S.C. § 1
 
 (h)(1)(A)-(C) (2008) (providing a top rate of 15 percent for most long-term capital gains).
 
 [2]
 
 Section 1235's basic requirements are straightforward. To qualify for automatic capital-gains treatment, income must be paid in exchange for a "transfer of property" that consists of "all substantial rights" to a "patent."
 
 [3]
 

 Id.
 

 § 1235. As this case illustrates, not every transfer of "rights" will suffice because the statute grants capital gains treatment only to transfers of
 
 property
 
 .
 

 II
 

 A
 

 Spireas is a pharmaceutical scientist who, with Dr. Sanford Bolton, invented "liquisolid technology."
 
 [4]
 
 That term describes certain drug-delivery techniques meant to facilitate the body's absorption of water-insoluble molecules taken orally. It is not, however, a one-size-fits-all solution. Rather, each application of "liquisolid technology ... is specific to a particular drug." App. 50-51 (Stipulation ¶ 21). And creating
 a clinically-useful liquisolid formulation of a given drug is not a matter of rote recipe; it requires creating, through trial and error, a process specific to the substance involved.
 

 The uniqueness of each liquisolid formulation meant that commercializing the technology was a tricky business. Before a drug could go to market in liquisolid form, a specific formulation had to "progress from ... conception to ... prototyp[ing] ..., to extensive further development, to a form that c[ould] be ... sold to the public, to actual manufacture for sale ... , and, finally, to actual marketing to the public."
 
 See
 
 1-6 William H. Byrnes & Marvin Petry, TAXATION OF INTELLECTUAL PROPERTY AND TECHNOLOGY § 6.02[1] (2017). Like most inventors, Spireas was unable to do all that alone, so in June 1998 he signed a licensing agreement with an established drugmaker, Mutual Pharmaceutical Co. (the 1998 Agreement).
 
 [5]
 
 The 1998 Agreement established a comprehensive framework for licensing liquisolid technology to Mutual, selecting prescription drugs to develop using the technology, developing and selling those drugs, and paying Spireas royalties out of the proceeds.
 

 Under the 1998 Agreement, Spireas granted Mutual two sets of exclusive rights: a circumscribed grant of rights to liquisolid technology and a much broader set of rights to specific drug formulations developed using that technology. First, the 1998 Agreement granted Mutual "[t]he exclusive rights to utilize the Technology," but "
 
 only
 
 to develop [liquisolid drug] Products that Mutual ... and [Spireas] ... [would] unanimously select." App. 69 (1998 Agreement § 2.1.1) (emphasis added). Second, Mutual received "[t]he exclusive right to produce, market, sell, promote and distribute ... said Products."
 

 Id.
 

 (1998 Agreement § 2.1.2).
 

 Having allocated Spireas and Mutual their respective rights to the liquisolid technology and liquisolid products, the 1998 Agreement established a multistep process for producing marketable products and paying Spireas for his work. That process began when Spireas and Mutual "select[ed] a specific Product to develop." App. 72 (1998 Agreement § 5.1). Selections had to be unanimous and made in writing. The parties' practice was to memorialize their selections in letters noting the "formal engagement of [Spireas] and Mutual" for a particular product. 1 T.C. Rec. 262-75. Once the parties were so engaged with respect to a particular drug, the process continued with the development of a practical liquisolid formulation, clinical testing, FDA approval, and actual marketing. And as sales were made and funds were received, Mutual would pay Spireas a 20 percent royalty on the gross profits it earned from liquisolid products.
 
 [6]
 

 B
 

 In March 2000, Spireas and Mutual entered into an engagement letter (the 2000
 Letter) in accordance with the 1998 Agreement. The 2000 Letter engaged Spireas to develop, using liquisolid technology, a generic version of a blood-pressure drug called felodipine.
 
 [7]
 
 That development process succeeded after what the Tax Court found was "considerable work ... to adapt [liquisolid technology] to felodipine's idiosyncrasies."
 
 Spireas v. Comm'r of Internal Revenue
 
 ,
 
 T.C. Memo 2016-163
 
 ,
 
 2016 WL 4464695
 
 , at *6 (Aug. 24, 2016). Spireas completed those efforts in relatively short order. "When he signed the March 2000 engagement letter, [Spireas] had completed roughly 30% of the work that ultimately resulted in" the liquisolid formulation of felodipine that he finished inventing "sometime after May 2000."
 
 Id.
 
 at *6, *10.
 

 The FDA approved Mutual's Abbreviated New Drug Application for liquisolid felodipine, and Mutual marketed it to great success. During the relevant time period, Spireas's royalties on felodipine sales totaled just over $40 million. Spireas reported all of those royalties as capital gains on his personal returns for tax years 2007 and 2008.
 

 In 2013, the Commissioner sent Spireas a notice of deficiency for 2007-2008. "The deficiencies arose from [the Commissioner's] conclusion that the Royalties [Spireas] received under [the 1998 Agreement] are taxable as ordinary income rather than as capital gain."
 
 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *1. The Commissioner determined that the royalties under the 1998 Agreement should have been treated as ordinary income, and Spireas therefore owed some $5.8 million in additional taxes.
 

 C
 

 After receiving the Commissioner's notice of deficiency, Spireas petitioned the United States Tax Court for a redetermination, and a brief trial was held. The main dispute in the Tax Court was whether Spireas had satisfied § 1235's requirement that he transfer "all substantial rights to a patent."
 
 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *8-9. IRS regulations define "all substantial rights to a patent" to mean "all rights ... which are of value at the time the rights to the patent ... are transferred."
 
 26 C.F.R. § 1.1235-2
 
 (b)(1) ;
 
 see also
 

 E.I. du Pont de Nemours & Co. v. United States
 
 ,
 
 432 F.2d 1052
 
 , 1055 (3d Cir. 1970).
 

 As the Tax Court put it, the parties' differences were "encapsulated in the question: 'All substantial rights
 
 to what
 
 ?' "
 
 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *9. The Commissioner argued that the dispositive point was Spireas's admitted failure to transfer all his rights to liquisolid technology
 
 generally
 
 . Mutual was not free to exploit every one of the technology's "potential application to thousands of drugs,"
 
 id.
 
 at *12, and could only develop and sell those "Products that Mutual ... and [Spireas] ... unanimously select[ed]," App. 69 (1998 Agreement § 2.1.1). Spireas acknowledged that he had retained valuable rights in the overall technology, but emphasized that he had transferred away all of his rights to the liquisolid formulation
 
 of felodipine
 
 .
 
 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *9.
 

 The Tax Court agreed with the Commissioner. It held that Spireas could not have transferred the rights to any particular liquisolid products in 1998 because no
 products existed at that time.
 

 Id.
 

 Thus, the only rights Spireas could have granted Mutual in 1998 were in liquisolid technology generally-"the rights to use the liquisolid technology ... and to make and sell any 'Products containing the Technology.' "
 

 Id.
 

 And since Spireas had granted Mutual far less than "all substantial rights" to the overall liquisolid technology, the royalty payments he received in 2007 and 2008 did not satisfy the requirements of § 1235 and were thus taxable as ordinary income.
 
 Id.
 
 at *14.
 

 After the Tax Court entered its final order, Spireas timely appealed.
 
 [8]
 

 III
 

 A
 

 Spireas's argument on appeal is clear: his royalty payments qualify for capital-gains treatment under § 1235 because he received them in exchange for "all substantial rights" to liquisolid felodipine. Spireas claims the 1998 Agreement
 
 prospectively
 
 assigned Mutual the relevant rights long before he actually invented that particular formulation. The Commissioner responds that Spireas has waived any argument based on a prospective transfer of rights by not presenting it to the Tax Court. Spireas replies by declaring that his "position has been consistent." Reply Br. 6.
 

 Spireas's
 
 ipse dixit
 
 is contrary to the record. In the Tax Court, Spireas asserted a transfer of rights that took place sometime "after [the felodipine formulation] was invented," 2 T.C. Rec. 323 (Spireas T.C. Opening Br. 12 ¶ 40), which happened "sometime between the end of 2000 and spring 2001." 2 T.C. Rec. 319 (Spireas T.C. Opening Br. 8 ¶ 23). Indeed, Spireas could hardly have been more explicit that he "
 
 did not transfer
 
 the felodipine technology in 1998." 2 T.C. Rec. 322 (Spireas T.C. Opening Br. 11 ¶ 36) (emphasis added). In the Tax Court Spireas argued the "fundamental" view that it was the post-March 2000 transfer of the felodipine formulation that "constituted a transfer of 'all substantial rights' " to Mutual. 2 T.C. Rec. 326-27 (Spireas T.C. Opening Br. 15-16).
 

 Our dissenting colleague disputes our reading of the record, contending that "Spireas [has] presented a complicated but consistent argument throughout," and that further consideration of waiver is therefore "not necessary." Dissent at 8, 11. The dissent makes two arguments to that effect, neither of which we find persuasive.
 

 First, the dissent emphasizes the many points of commonality between Spireas's position here and in the Tax Court. To be sure, Spireas has consistently "relie[d] on both the 1998 Agreement and the March 2000 Engagement letter," and argued that they "operat[ed] in conjunction" to transfer to Mutual rights to liquisolid felodipine. Dissent at 1. And the dissent rightly notes that Spireas has always maintained that those two documents are "of a piece and related," making up a "consistent course of dealing," Dissent at 2, and that the ultimate terms on which Mutual obtained "rights to drug 'Products' ... depended upon the terms of the 1998 Agreement," Dissent at 3.
 

 Notably absent, however, from that discussion of
 
 which instruments
 
 served to transfer rights in liquisolid felodipine is any mention of
 
 when
 
 Spireas claimed that transfer took place. The dissent appears to suggest that Spireas's consistency on the former point suffices to insulate him from
 waiver. Dissent at 5 ("Spireas's consistent emphasis on the same contractual provisions distinguishes his case from cases in which we have found waiver."). But where waiver is concerned, the question is not whether a party's position has been mostly consistent, or generally inclined toward the same subject as that raised on appeal, but whether the same "theory" was "squarely" raised in the trial court.
 
 Doe v. Mercy Catholic Med. Ctr.
 
 ,
 
 850 F.3d 545
 
 , 558 (3d Cir. 2017) (citing
 
 United States v. Joseph
 
 ,
 
 730 F.3d 336
 
 , 338-42 (3d Cir. 2013) ). So even accepting at face value the dissent's account of Spireas's consistency on some issues, that sheds no light on whether Spireas has waived his new (and contradictory) argument regarding the timing of the transfer.
 

 The dissent's second point-that Spireas has been consistent in distinguishing between legal transfer of
 
 rights
 
 to felodipine in 1998, followed by a physical handover of
 
 possession
 
 in 2000-fares no better. Although that argument does address Spireas's timing theory head-on, its core premise is belied by the record. As we have noted, Spireas's opening brief to the Tax Court made his position clear: (1) "Spireas transferred the felodipine ... technolog[y] ... at some point after March 2000," and (2) "Spireas' transfer ...
 
 constituted a transfer of 'all substantial rights'
 
 ... to [Mutual]." 2 T.C. Rec. 327 (Spireas T.C. Opening Br. 16) (emphasis added).
 

 The dissent's distinction between an earlier "legal transfer" and subsequent "physical transfer" exists only in what we find to be a strained reading of the single oral colloquy quoted in that opinion.
 
 See
 
 Dissent at 6. Spireas's briefing discussed only a single "transfer" that allocated "rights" (whether or not it involved a physical handover as well). 2 T.C. Rec. 327 (Spireas T.C. Opening Br. 16). We will not read an isolated extemporaneous exchange to advance a theory so at odds with the one Spireas labeled "fundamental" in his written submissions. 2 T.C. Rec. 326 (Spireas T.C. Opening Br. 15).
 

 B
 

 Citing our seminal precedent in
 
 United States v. Joseph
 
 ,
 
 730 F.3d 336
 
 (3d Cir. 2013), the Commissioner contends that Spireas cannot argue on appeal that he transferred rights to felodipine in 1998 after he took the contrary position in the Tax Court.
 
 See also
 

 Gen. Refractories Co. v. First State Ins. Co.
 
 ,
 
 855 F.3d 152
 
 , 162 (3d Cir. 2017) (applying
 
 Joseph
 
 to a civil case). Under
 
 Joseph
 
 , "merely raising an
 
 issue
 
 that encompasses the appellate argument is not enough."
 
 730 F.3d at 337
 
 . Whether an argument remains fair game on appeal is determined by the "degree of particularity" with which it was raised in the trial court,
 

 id.
 

 at 341
 
 , and parties must do so with "exacting specificity,"
 

 id.
 

 at 339
 
 . "[O]ur precedents reveal at least two characteristics that identical arguments always have. First, they depend on the same legal rule or standard. Second, the arguments depend on the same facts."
 

 Id.
 

 at 342
 
 (citation omitted).
 
 [9]
 

 But even under that strict standard, Spireas's shifting position on the
 
 fact
 
 of when Mutual obtained its rights in liquisolid felodipine does not necessarily mean his entire
 
 argument
 
 is waived. Applying
 
 Joseph
 
 's particularity analysis is not a matter of comparing every stray statement or claim made in the Tax Court. Rather,
 
 Joseph
 
 instructs us to compare arguments, a term that we have explained is synonymous with "theories," "grounds," or "bases" for "granting relief."
 
 730 F.3d at 340-42
 
 . To be sure,
 
 Joseph
 
 teaches that two arguments can be the same only if they "depend on the same facts,"
 

 id.
 

 at 342
 
 , but not every fact that appears in a brief is one on which an argument "depends." Whether an argument "depends" on a given fact requires reference to the applicable legal standard. As the Supreme Court has observed in another context, "the substantive law"-in this case, § 1235 of the Internal Revenue Code -"will identify which facts are material."
 
 Anderson v. Liberty Lobby
 
 ,
 
 Inc.
 
 ,
 
 477 U.S. 242
 
 , 248,
 
 106 S.Ct. 2505
 
 ,
 
 91 L.Ed.2d 202
 
 (1986).
 

 C
 

 Under § 1235's test for capital-gains treatment, changing the date on which Spireas granted Mutual rights to liquisolid felodipine changes the legal theory on
 which his position depends. Spireas's royalty payments are entitled to capital-gains treatment only if Mutual paid them in exchange for a transfer of "
 
 property
 
 consisting of all substantial rights" to the liquisolid formulation of felodipine.
 
 26 U.S.C. § 1235
 
 (a) (emphasis added). Spireas cannot make that argument for the first time on appeal because it depends on a different legal standard for when that formulation became "property" than his argument to the Tax Court.
 

 Section 1235 is explicit that in order to secure capital-gains treatment, an inventor must make a transfer of
 
 property rights that he actually possesses
 
 at the time of the grant. Accordingly, Spireas had to explain: (1) when he granted Mutual rights to liquisolid felodipine, and (2) how he obtained a property interest in that formulation prior to the grant. The account Spireas presented to the Tax Court was clear: he granted Mutual its rights
 
 after
 
 the invention of the liquisolid formulation was complete, which happened sometime after March 2000. 2 T.C. Rec. 327 (Spireas T.C. Opening Br. 16).
 

 That timeline included a straightforward theory of when and how Spireas obtained his interest in the felodipine formulation. To possess a transferable property interest in an invention, the inventor generally must have "reduced [it] to actual practice."
 
 See
 

 Burde v. Comm'r of Internal Revenue
 
 ,
 
 352 F.2d 995
 
 , 998 n.3 (2d Cir. 1965) ;
 
 see generally
 
 Byrnes & Petry,
 
 supra
 
 , § 6.05[3].
 
 [10]
 
 That basic patent-law rule accords with the text of § 1235, which provides that a non-inventor may be a patent "holder" entitled to capital-gains treatment on the proceeds of a subsequent transfer only if he obtained his interest in exchange for consideration paid to the inventor prior to the invention's "actual reduction to practice."
 
 26 U.S.C. § 1235
 
 (b)(2). Put another way, "actual reduction to practice" is the line between a transfer of a then-existing "property" interest (which entitles the holder-transferor to
 
 immediate
 
 capital gains treatment) and a transfer or grant of some other legal interest (which makes the transferee the new "holder" entitled to pay the capital gains rate against the proceeds of a transfer that takes place
 
 after
 
 a subsequent reduction to practice).
 

 "Actual reduction to practice" is a term of art in patent law,
 
 see generally
 
 U.S. Patent and Trademark Office,
 
 Manual of Patent Examining Procedure
 
 § 2138.05(II) (9th ed. Rev. 7, Nov. 2015), that has a slightly looser meaning in the tax context. "Generally, an invention is reduced to actual practice when it has been tested and operated successfully under operating conditions."
 
 26 C.F.R. § 1.1235-2
 
 (e). The Tax Court decision from which the IRS borrowed that language clarifies things a bit further: "it [is] not necessary that testing ... proceed[ ] to the point where the invention was actually ready to be put into commercial production ..., but rather ... that the tests should suffice to persuade ... that the product will serve the purpose for which it is designed."
 
 Comput. Sci. Corp. v.
 

 Comm'r of
 

 Internal Revenue
 
 ,
 
 63 T.C. 327
 
 , 352-53 (1974) (internal quotation marks omitted).
 

 Here, the Tax Court found that Spireas's "invention of the felodipine formulation occurred sometime between May 10, 2000 ... and May 2001."
 
 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *7. Spireas does not challenge that finding on appeal. The Tax Court described the "invention" of the formulation rather than its "actual reduction to practice," but the relevant patent law makes clear that if Spireas invented the formulation, he necessarily reduced it to practice. "Making [an] invention requires conception and reduction to practice."
 
 Solvay S.A. v. Honeywell Int'l Inc.
 
 ,
 
 742 F.3d 998
 
 , 1000 (Fed. Cir. 2014). And conception necessarily precedes actual reduction to practice, since by definition "[c]onception is [only] complete when one of ordinary skill in the art could construct the apparatus."
 
 Sewall v. Walters
 
 ,
 
 21 F.3d 411
 
 , 415 (Fed. Cir. 1994). The corollary is that actual reduction to practice always completes the process of "inventing." So the Tax Court's finding that Spireas "invented" the felodipine formulation after May 2000 necessarily implies a finding that he reduced it to practice in the same timeframe.
 

 Spireas's original theory hinged on a post-invention transfer of rights. On that account Spireas reduced the felodipine formulation to practice around May 2000-giving him, in theory, the property interest that the statute requires-and only later passed his interest on to Mutual. But Spireas has abandoned that theory here, insisting instead that he transferred rights to Mutual in 1998.
 
 See
 
 Reply Br. 6 ("What happened in 1998 is that [Spireas] assigned Mutual his
 
 rights
 
 to future Products."). Because that was at least two years before the invention of the felodipine formulation, Spireas's current position cannot depend on the legal standard of reduction to actual practice to establish that he held a property right at the time of transfer. Nor can it depend on the same facts as did his argument to the Tax Court, the timing of felodipine's invention central among them. Spireas's sole claim on appeal is therefore waived under
 
 Joseph
 
 .
 
 [11]
 

 IV
 

 For the reasons stated, and because Spireas has not offered any reason why we should excuse his waiver, we will not evaluate Spireas's new argument on appeal. The decision of the Tax Court will be affirmed.
 

 Spireas filed the tax returns at issue jointly with his wife, Amalia Kassapidis-Spireas. Ms. Kassapidis-Spireas joined in the petition to the Tax Court and also joins this appeal. Since none of Ms. Kassapidis-Spireas's conduct is relevant to this case, we refer only to her husband.
 

 The cited rates apply to the 2007 and 2008 tax years at issue here, but long-term capital gains receive similarly-favorable treatment under current law.
 
 Compare
 
 Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11001(a),
 
 131 Stat. 2054
 
 , 2054-55 (to be codified at
 
 26 U.S.C. § 1
 
 (j)(2)(A) ) (providing a 37-percent top marginal rate for married taxpayers filing jointly),
 
 with
 

 26 U.S.C. § 1
 
 (h)(1)(A)-(D) (providing a 20-percent top rate for most long-term capital gains).
 

 IRS regulations provide that "[i]t is not necessary that the patent or patent application for the invention be in existence" to receive capital-gains treatment under § 1235,
 
 26 C.F.R. § 1.1235-2
 
 (a), and courts have long held that § 1235 is satisfied "so long as the invention is patentable."
 
 See, e.g.
 
 ,
 
 Burde v. Comm'r of Internal Revenue
 
 ,
 
 352 F.2d 995
 
 , 998 n.4 (2d Cir. 1965). The Tax Court found that the drug formulations involved in this case were patentable,
 
 Spireas v. Comm'r of Internal Revenue
 
 ,
 
 T.C. Memo 2016-163
 
 ,
 
 2016 WL 4464695
 
 , at *6 n.2 (Aug. 24, 2016), and the Commissioner does not challenge that determination.
 

 Dr. Bolton is deceased, and his estate is not a party to this litigation.
 

 We describe the parties to the 1998 Agreement in simplified terms. United Research Laboratories, Inc.-a corporate affiliate of Mutual-was also a party to the 1998 Agreement. Since none of United's actions are relevant in this case, we refer only to Mutual. In addition, Spireas was joined on the licensor side of the equation by Dr. Bolton and Hygrosol Pharmaceutical Corp., which was an S corporation owned equally by Spireas and Bolton. Certain rights under the 1998 Agreement were granted to Hygrosol, rather than to Spireas and Bolton personally. For simplicity's sake, we refer to Spireas even when the 1998 Agreement refers to Hygrosol.
 

 The 1998 Agreement also provided for Spireas to earn payments as compensation for certain independent consulting work he performed during the product selection and development process. The tax treatment of those payments is not at issue in this appeal.
 

 The 2000 Letter also engaged Spireas to develop liquisolid formulations for an arrhythmia drug called propafenone. A small portion of the royalty payments at issue in this appeal are attributable to propafenone sales. The Tax Court held that the analysis applicable to the two drugs was "identical in all material aspects," and did not discuss propafenone separately.
 
 See
 

 Spireas
 
 ,
 
 2016 WL 4464695
 
 , at *6 n.2. Neither party to this appeal challenges the Tax Court's sensible approach.
 

 The Tax Court had jurisdiction over Spireas's petition under
 
 26 U.S.C. §§ 7442
 
 and 6214. We have jurisdiction under
 
 26 U.S.C. § 7482
 
 (a)(1). Venue is proper in this Court under
 
 26 U.S.C. § 7482
 
 (b)(1)(A) because Spireas and his wife are Pennsylvania residents.
 

 The dissent faults us for "rel[ying] on
 
 Joseph
 
 at the exclusion of our precedent on civil waiver." Dissent at 330. In the dissent's view
 
 Joseph
 
 is "instructive" in the civil context, but fails to account for "our prior precedent that
 
 civil
 
 waiver is a prudential doctrine to be applied in a case-specific manner
 
 ."
 
 Id.
 

 (emphasis added). We disagree that our application of
 
 Joseph
 
 in this case is inappropriate. At the outset, the dissent's concession that our Court has already "appl[ied]
 
 Joseph
 
 in the civil context" demonstrates that our reliance is hardly novel.
 

 Id.
 

 Nevertheless, because those prior decisions have simply cited
 
 Joseph
 
 without much in the way of analysis, we think that a few words clarifying its role in civil cases are in order.
 
 Joseph
 
 arose out of Rule 12 of the Federal Rules of Criminal Procedure, which the dissent characterizes as a very "narrow context."
 

 Id.
 

 We agree that Rule 12 has some unique features. But the absence of those characteristics in the civil context clarify
 
 Joseph
 
 's scope, not its applicability.
 

 Rule 12 provides in relevant part that certain "defenses, objections, and requests must be raised by pretrial motion" if possible. Fed. R. Crim. P. 12(b)(3) (emphasis added). And we have held that the result of failure to do so is an outright waiver of the argument in question.
 
 United States v. Rose
 
 ,
 
 538 F.3d 175
 
 , 176 (3d Cir. 2008). In that respect, Rule 12 sets up a different scheme than prevails under Criminal Rule 52-which provides that arguments "not brought to the [district] court's attention" are generally reviewable for plain error, FED. R. CRIM. P. 52(b) -and in the civil context-where courts retain "discretionary power to address issues that have been waived" under appropriate circumstances,
 
 Huber v. Taylor
 
 ,
 
 469 F.3d 67
 
 , 74 (3d Cir. 2006).
 

 But while we have held that Rule 12 enacts a unique rule with respect to the
 
 consequences
 
 of not raising an argument, we have never suggested the same with respect to the distinct question of whether an argument was
 
 actually raised
 
 . Nor does anything in the text of Rule 12 itself provide any reason to do so. References to "raising" arguments are commonplace in civil cases,
 
 see, e.g.
 
 ,
 
 Huber
 
 ,
 
 469 F.3d at 74
 
 , and
 
 Joseph
 
 implicitly recognized that doctrines respecting the failure to raise arguments generally incorporate three distinct inquiries: (1) whether an argument was made,
 
 see
 

 730 F.3d at 338
 
 , (2) the default consequences of failing to make an argument (i.e. whether an argument is waived, forfeited, or merely subject to a less-forgiving standard of review),
 
 see
 

 id.
 

 at 339 n.3, and (3) the special circumstances under which those consequences may be excused,
 
 see
 

 id.
 

 at 338 n.2 (noting that waiver under Rule 12 may be excused for "good cause");
 
 see
 

 also
 

 Huber
 
 ,
 
 469 F.3d at 74-75
 
 (citations omitted) (discussing examples of analogous civil doctrines).
 

 As the dissent points out, the prudential roots of the civil waiver doctrine differentiate it from its criminal analogues with respect to the second and third questions-failure to raise an argument in a civil case is generally met with relatively softer consequences, and is more readily excused, than in a criminal case. Indeed, we recognized our discretion to reach an argument that was not made to the district court in a number of circumstances, such as where it presents a purely legal question we think it is in the public interest to resolve.
 
 See e.g.
 
 ,
 
 Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.
 
 ,
 
 855 F.3d 163
 
 , 172 n.4 (3d Cir. 2017). But
 
 Joseph
 
 addressed (and this appeal implicates) only the threshold question of whether an argument was made in the first place.
 
 See
 

 United States v. Washington
 
 ,
 
 869 F.3d 193
 
 , 208 n.53 (3d Cir. 2017) (noting that
 
 Joseph
 
 's "specific framework ... does not limit our discretion to excuse waiver or forfeiture concerns"). We see no basis for subjecting that inquiry to different standards in civil and criminal cases, and clarify today that
 
 Joseph
 
 provides the governing rule for both. Under that rule, Spireas failed to raise his prospective transfer argument in the Tax Court, and we decline to exercise our discretion to reach it on appeal.
 

 While the dissent's assertion that "transfers of future inventions are valid" is correct as a matter of contract law, Dissent at 328 (citing Byrnes & Petry, supra, § 6.05[4] ), it is also a
 
 non sequitur
 
 . Agreements to transfer future patents are enforceable even if no property interest exists at the time of contracting. Byrnes & Petry, supra, § 6.05[3][a] ("[P]arties can agree
 
 in advance
 
 that
 
 upon reduction to practice
 
 the inventor
 
 will
 
 convey the property.") (emphasis added),
 
 quoted by
 
 Dissent at 328. For tax-law purposes, the question isn't whether the parties made a valid and enforceable contract, but whether in doing so they transferred a then-existing interest in property.
 

 Judge Shwartz would also conclude, even if the Court were to consider the merits of Spireas's argument based on a transfer of rights in 1998, that Spireas still transferred less than all substantial rights in the liquisolid technology that was the subject of the 1998 Agreement, and thus would not be entitled to capital-gains treatment.