GEORGE N. AND LILLIAN SOFFRON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 78117–78120.   Filed February 24, 1961.

*Lester H. Salter, Esq.,* and *James R. McGowan, Esq.,* for the petitioners.

*Raymond T. Mahon, Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax for the taxable year 1956 as follows:

| Docket No. | Deficiencies |
|---|---|
| 78117 | $5,381.75 |
| 78118 | 5,534.51 |
| 78119 | 5,519.09 |
| 78120 | 5,549.51 |

The sole question presented is whether the amount of $19,253.25 received by each petitioner in the taxable year 1956 was a long-term capital gain from the sale of a patent or the petitioner's distributive share of the partnership income.

### FINDINGS OF FACT.

Petitioners George N. and Lillian Soffron, husband and wife, Peter and Merle Soffron, husband and wife, Stephen N. and Frances E. Soffron, husband and wife, and Thomas and Sophie Soffron, husband and wife, are all residents of Massachusetts. All filed joint income tax returns for the taxable year 1956 with the director of internal revenue for the district of Massachusetts.

George N. Soffron, Peter Soffron, Stephen N. Soffron, and Thomas Soffron, hereinafter referred to as petitioners, are brothers who from 1938 to June 30, 1950, were shareholders in a corporation known as Soffron Brothers Inc., a corporation engaged in the business of producing, packaging, and distributing fresh and frozen clams at wholesale. On June 30, 1950, the petitioners ceased to do business as a corporation and an equal partnership known as Soffron Brothers, hereinafter referred to as the partnership, was formed. The partnership agreement of 1950 was replaced by a new partnership agreement executed on April 1, 1953.

---

[1] Proceedings of the following petitioners are consolidated herewith: Peter and Merle Soffron, Docket No. 78118; Stephen N. and Frances E. Soffron, Docket No. 78119; and Thomas and Sophie Soffron, Docket No. 78120.

As a result of a depleting supply of soft-shell clams, the petitioners began to experiment with sea clams with a view to developing a method of processing such clams into a fryable clam product. They sliced the tongue or foot portion of the sea clam and found that when sliced to a thickness of approximately one-eighth of an inch, it was a fryable product. They subsequently purchased a slicer which they adapted to their process in order to ascertain if the sliced clams could be produced on a commercial basis. These experiments were conducted in an experimental kitchen maintained in the partnership's plant at Ipswich, Massachusetts.

Having found that the sliced clams could be commercially produced, the petitioners in March 1951, commenced selling them under the partnership name and have continued so to sell them up to and including the taxable year.

The petitioners, as individuals, filed a formal application for a patent with the United States Patent Office on the method of processing the sea clams on March 18, 1953. They received a "Notice of Allowance" on October 21, 1955, from the Commissioner of Patents and on December 6, 1955, a patent, No. 2,726,157, entitled "Method of Preparing Sea Clams to Provide a Fryable Product" was issued to them.

On February 27, 1956, the petitioners executed an "Assignment and Agreement" which purported to sell, assign, and transfer to the partnership their interest in the patent. In consideration for this assignment, the partnership agreed to pay the petitioners 48 cents for each gallon of clams produced and prepared for sale by the partnership under the patented method. The total compensation was to be divided equally among the petitioners.

From 1951 until the assignment on February 27, 1956, the partnership had used the process for producing and preparing sliced sea clams. During this period the petitioners received no compensation from the partnership in respect to its use of the process.

During the taxable year petitioners received $77,013 from the partnership, which represented 160,443¾ gallons of sea clams at 48 cents per gallon, produced and prepared for sale by the partnership during its taxable year which ended March 31, 1956. The individual share of each of the petitioners was $19,253.25 which each reported as income received from the sale or exchange of a capital asset held for more than 6 months.

On July 30, 1956, other dealers in seafood, alleging that they had each received letters on or about June 20, 1956, threatening them with suit for infringing United States Patent No. 2,726,157, brought suit in the United States District Court for the District of Massachusetts, asking for a judgment declaring either that they were not infringing

United States Patent No. 2,726,157 or that the patent was invalid. The United States District Court granted plaintiffs' motion for summary judgment. On appeal, 246 F. 2d 769, the Court of Appeals for the First Circuit affirmed the decision of the District Court and found the patent to be invalid because the process had been in public use for more than 1 year prior to the date of the patent application.

OPINION.

Section 1235 of the Internal Revenue Code of 1954 is a specific section pertaining to the sale or exchange of patents. Amounts realized from the sale of a patent are accorded capital gains treatment if the transaction meets the requirements of the statute. An important requisite of the section is that the sale or exchange must be a "transfer * * * consisting of all substantial rights to the patent." To ascertain if this requirement has been satisfied it is often necessary to cast aside the superficial indicia of the transfer and reach the core of the transaction to view its true economic realities. The committee report clearly indicates that it was the intent of the Congress that such a procedure of analysis be utilized. The report, S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 439 (1954), states:

The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a "sale or exchange" under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for "holders" as herein defined. * * * It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones.

We agree with the regulations, sec. 1.1235–2(d)(2), that for purposes of section 1235 a partnership cannot be a "holder" of a patent and therefore cannot qualify for capital gains treatment. However, each member of a partnership who is an individual may qualify as a holder as to his share of a patent owned by the partnership. When the status of a partner under section 1235 is considered in relation to this situation, we find that both before and after the transfer the petitioners were deemed to be "holders" of a one-fourth interest in the patent. Before the transfer each petitioner was the owner of an undivided one-fourth interest as an individual and after the transfer each was deemed to own a one-fourth interest in the patent as a result of his one-fourth interest in the partnership. We are unable to detect a transfer of "all substantial rights" to the patent by the petitioners

inasmuch as the transfer did not effect any substantial change in their positions insofar as section 1235 is concerned. We think an examination of all the attendant facts with a view to the economic realities of the transaction definitely establishes that the assignment was a formalistic attempt to come within the purview of section 1235 in order to transform a portion of the partnership income into capital gains, while, at the same time, retaining control of the patent within the same economic group. Accordingly, it does not qualify under section 1235.

The petitioners contend that the assignment was necessary to prevent the patent from falling into the hands of their competitors. Although such a transfer may have been necessary formally to bring the legal title to the patent into the partnership for local law purposes, Mass. Ann. Laws, ch. 108A, sec. 25, it has little impact when the transaction is considered for Federal tax purposes. *Commissioner* v. *Tower*, 327 U.S. 280 (1946); *Lusthaus* v. *Commissioner*, 327 U.S. 293 (1946).

Inasmuch as the transfer does not qualify under section 1235, we accept as correct the procedure propounded in the regulations which provides that—

section 1235 shall be disregarded in determining whether or not such transfer is the sale or exchange of a capital asset. * * * The tax consequences of such transfers shall be determined under other provisions of the internal revenue laws.

The failure of the transaction to come within the scope of section 1235 brings into focus section 707, a new section incorporated into the Internal Revenue Code of 1954 relating to transactions between partner and partnership. Section 707 provides, in part, that:

(b) (2). GAINS TREATED AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221—

(A) between a partnership and a partner owning, directly or indirectly, more than 80 percent of the capital interest, or profits interest, in such partnership * * *

\* \* \* \* \* \* \*

any gain recognized shall be considered as gain from the sale or exchange of property other than a capital asset.

(3) OWNERSHIP OF A CAPITAL OR PROFITS INTEREST.—For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section.

The transferee in this transaction was the partnership and to resolve the standing of the patent in its hands we look to the provisions of section 1221 which state that the term capital asset does not include "property, used in * * * [a] trade or business, of a character which

is subject to the allowance for depreciation provided in section 167." We do not think the proposition that the patent was a necessary ingredient in the carrying on of the partnership business can be challenged, therefore the only remaining question concerns the depreciation aspects under section 167. The correct answer to this question is in sec. 1.167(a)–6, Income Tax Regs., which provides that "the cost or other basis of a patent * * * shall be depreciated over its remaining useful life." The conclusion is that in the hands of the partnership the patent was "property other than a capital asset defined in section 1221."

To ascertain whether the petitioners owned "directly or indirectly, more than 80 percent of the capital interest" of the partnership, we are referred by section 707(b)(3) to the rules for constructive ownership of stock of section 267(c). Section 267(c)(4) states that in ascertaining constructive ownership "the family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants." The petitioners here are brothers as well as partners, therefore, each held a 100 percent interest in the partnership; for purposes of section 707, 25 percent directly and 75 percent indirectly as a result of the relationship attribution factor.

The inability of the assignment to qualify for the benefits of section 1235 renders section 707 applicable and under that section the amounts realized constitute ordinary income. It follows that the Commissioner's determination is sustained.

*Decisions will be entered for the respondent.*