MARTIN F. EMORY AND NAN EMORY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4455–63.   Filed March 31, 1967.

*Robert J. Wolpert*, for the petitioners.
*Leon M. Kerry*, for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1958 in the amount of $2,739.88.

The sole issues for decision are (1) whether royalty income received by Martin F. Emory is ordinary income or long-term capital gain pursuant to section 1235 of the Internal Revenue Code of 1954; or, (2) whether, alternatively, the royalty received by Emory is long-term capital gain pursuant to section 1231 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT

Some of the facts were stipulated, and the stipulation of facts and the exhibits attached thereto are so found.

Petitioners Martin F. Emory (hereinafter referred to as Emory) and Nan Emory, husband and wife, filed a joint Federal income tax return for the calendar year 1958, prepared on the basis of the cash method of accounting, with the district director of internal revenue, Upper Manhattan, New York.

Emory has been connected, in one way or another, with the promotion and sale of cosmetics, toiletries, and pharmaceuticals since the mid-1940's. In the course of his business activities, he became acquainted with Max A. Burde (hereinafter referred to as Burde) and Bernard Weiss (hereinafter referred to as Weiss).[1]   Emory, Burde,

---

[1] Since 1940, Burde and Weiss have been partners engaged in the business of selling drugs, cosmetics, toiletries, and related products to drug and department stores on behalf of manufacturers. The name of their partnership is Keystone Co.

and Weiss are not related to each other by blood or in law. At least on one occasion prior to the transactions described herein, Emory, Burde, and Weiss have been associated in a business venture. That venture, conducted in corporate form, was known as Sardeau, Inc. (hereinafter sometimes referred to as the corporation). It involved the sale or distribution of perfumes to retail stores. The business proved unsuccessful, and in 1953 Burde and Weiss discontinued their association with it. However, their wives, Berthe C. Burde and Peggy S. Weiss, had experience in the cosmetics business and joined with Emory to continue the business as a partnership (hereinafter referred to as Perfume Co.). Sardeau, Inc., remained in existence solely because of the fact that its annual State franchise taxes continued to be paid.

In the early part of April 1954, Emory contacted Burde and Weiss with regard to a bath oil formula that he had conceived, which subsequently became known as Sardo. Emory proposed to transfer to each of them a one-third interest in the formula in return for their promise to pay all of the development costs, including any possible legal and patent fees, the cost of a chemist, and the production costs of a commercial batch of the bath oil. In the latter part of that month, Burde and Weiss accepted Emory's offer. It was estimated that Burde and Weiss would probably incur costs of approximately $12,000 in connection with the commercial development of the bath oil, consisting of $1,000 for attorney fees in connection with a patent application, $1,000 for other legal fees, $500 to be paid to a chemist for producing samples of the product, $5,000 or $6,000 as the cost of producing a 50-gross commercial batch, and $2,000 to $3,000 for laboratory testings of the product. It was contemplated from the very outset of their agreement that Burde and Weiss would finance Emory in connection with the development of the bath oil and that after the oil had been sufficiently developed they would sell the formula and the bath oil invention to some large cosmetic manufacturer.

At the time Burde and Weiss orally accepted Emory's offer, Emory had made no effort to develop this product. Prior to that time he had never even attempted to make a sample of the bath oil. In fact, Emory had not found it necessary to reduce the formula to writing prior to that time since he had committed the elements of the formula to memory.

In May 1954, Burde and Weiss brought Emory to their attorney, explained the terms of their agreement to the attorney, and requested him to reduce their agreement to writing. Burde and Weiss advised the attorney that any services rendered in connection with the bath oil formula or requested by either of them or by Emory should be billed to Burde and Weiss personally and that Emory would not bear any part of the legal fees.

In June 1954, Burde and Weiss contacted a chemist and retained him to prepare samples of the bath oil. Emory conferred with the chemist and revealed the bath oil formula to him. The chemist in August of that year delivered six 4-ounce samples to Emory. Emory, Burde, and Weiss, as well as members of their immediate families, made personal tests of the samples.

During the summer of 1954, Emory, Burde, and Weiss, at the suggestion of Burde's and Weiss' lawyer, conferred with a firm of patent lawyers concerning the advisability of applying for a patent on the bath oil formula. At this meeting Weiss advised the patent attorneys that all services rendered and disbursements made in connection with the bath oil invention should be billed to Burde and Weiss personally or to their partnership, Keystone Co. The patent attorneys were of the opinion that the formula was patentable and that Emory, Burde, and Weiss might have a better chance of selling the formula to some large cosmetic manufacturing company if it were patented. They held discussions concerning the filing of a patent application upon a number of occasions during that summer. In connection therewith, the matters of patent infringement and protecting the formula were discussed. In the early part of December 1954, it was finally decided that an application for a patent would be filed.

On December 21, 1954, Burde, Weiss, and Emory executed a written agreement memorializing their oral agreement of April 1954. There was no basic difference between the April 1954 oral agreement and the December 21, 1954, written agreement. That agreement provided, in pertinent part, as follows:

WHEREAS [Emory] has with the cooperation and aid of [Burde and Weiss] invented a formula for a bath oil which is also a remedy against dry skin and skin irritation, which invention also consists of a new use for a compound of previously known ingredients, and;

WHEREAS the parties hereto have previously orally among themselves agreed on their respective interests in said inventions and are now desirous of reducing their said agreement to writing;

Now, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. [Emory] hereby assigns, transfers and sets over unto [Burde and Weiss] two-thirds of all his right, title and interest in and to the inventions aforementioned, namely the formula for said oil, the process of manufacturing the same, and the new use thereof, all of which are now known to all the parties.

To HAVE AND TO HOLD such inventions and income therefrom and rights thereto, to [Burde and Weiss], one-third thereof to each, their heirs and assigns for their own use and behoof, forever.

2. [Emory] hereby further agrees to file or cause to be filed in the United States Government Patent Office in his own name, an application for letters patent to said inventions and to execute all necessary papers and documents required in connection therewith, now being prepared by [certain patent lawyers].

3. [Emory] further agrees that immediately upon his receipt of a serial number in connection with such application to the United States Patent Office, he will execute and deliver to each of [Burde and Weiss], an assignment of said invention or inventions and patent application in proper recordable form as required by the said United States Patent Office for a one-third interest in said application for patent or applications for patents, and to any patent or patents that may be issued thereunder.

4. [Emory, Burde, and Weiss each] further agrees that he will at no time and in no wise transfer or encumber his one-third interest in said invention or inventions and in said patent application or applications, or any patent or patents that may be issued thereon, without the consent of the other parties.

5. [Burde and Weiss] agree that they will continue to finance the invention or inventions aforementioned, and that they will pay all bills due and to become due to [certain patent lawyers] in connection with the preparation of said patent application or applications, and in connection with the prosecution thereof, and will also pay all bills due or to become due to any chemist or chemists that has aided in the perfection of the said invention and in reducing the ingredients thereof to commercially marketable form.

6. This agreement shall inure for the benefit of, and shall be binding upon the heirs, assigns and representatives of the parties here.

As of December 21, 1954, when the oral agreement of April 1954, between Emory, Burde, and Weiss was reduced to writing, only three sets of samples of the bath oil had been produced. No tests, other than those made through personal use by Emory, Burde, and Weiss and members of their immediate families, had been conducted. Although a 200-gallon commercial batch of the bath oil had been ordered as of that time, it had not been prepared until sometime in the first week of January 1955. In the absence of a "commercial run," it was not certain that the bath oil could be satisfactorily produced in large quantities. No laboratory tests were possible without a commercial batch. Until laboratory tests were conducted it could not be known how the bath oil would stand up as to efficiency, "shelf life," or therapeutic value.

In the latter part of December, after the agreement between Emory, Burde, and Weiss had been reduced to writing, Emory met with his own lawyer to show him a copy of the agreement. Emory also mentioned that he was then interested in producing and marketing the bath oil himself, instead of merely selling the bath oil formula to some large cosmetic company as had been previously agreed among Emory, Burde, and Weiss. The lawyer advised Emory to discuss the matter with Burde and Weiss.

On January 2, 1955, Emory met with Burde, Berthe Burde, Weiss, and Peggy Weiss and advised them of his interest in producing and marketing the bath oil himself rather than selling the invention to a manufacturer. It was finally decided that in return for a royalty, to be fixed between 5 and 7 percent at a later date when producing costs were ascertained, Emory, Burde, and Weiss would transfer their

rights in the bath oil formula to a newly formed partnership consisting of Emory, Berthe Burde, and Peggy Weiss.

On January 2, 1955, Emory, Berthe Burde, and Peggy Weiss formed a new partnership known as Sardo by Sardeau (hereinafter referred to as the Sardeau partnership). Each partner was to contribute $5,000 in return for an equal one-third interest therein. A formal partnership agreement was filed in the office of the New York County clerk on January 20, 1955.

Samples of the commercial batch of the bath oil were delivered to Emory during the first week in January 1955. The samples were packaged and bottled when received. Without waiting for laboratory tests to be conducted thereon, Emory delivered some of the samples to Weiss and requested Keystone Co. to solicit orders for the bath oil on a commission basis. On January 6, 1955, Weiss obtained an order for 10 gross of the bath oil from a large New York department store. As of January 7, 1955, when the first order was shipped to the department store, no commercial or laboratory tests had been conducted on the commercial batch of the bath oil.

On February 12, 1955, Emory executed and acknowledged a patent application covering the bath oil formula. This application was duly filed with the U.S. Patent Office on February 14, 1955, and assigned serial No. 488,157. On May 31, 1955, Emory executed separate assignments transferring to both Burde and Weiss a one-third interest in this patent application and in any patent or patents, including improvements thereon, that might be issued thereunder. The bath oil formula and the method of producing the bath oil constitute a patentable invention, and Emory is the inventor thereof.

In May 1955 it was agreed that the royalty to be paid to Emory, Burde, and Weiss by the Sardeau partnership should be fixed at 6 percent of the net sales commencing January 1, 1956, and that a flat payment of $2,500 would be made for all sales in 1955. On May 31, 1955, a written agreement was entered into between Emory, Burde, and Weiss, on the one hand, and the Sardeau partnership, on the other hand. This agreement provided, in pertinent part, as follows:

THIS AGREEMENT made this 31st day of May, 1955, by and between MAX BURDE, MARTIN F. EMORY and BERNARD WEISS, all hereinafter designated jointly as the "LICENSORS" and MARTIN F. EMORY, [Burde's wife], and [Weiss' wife], co-partners doing business as SARDO by SARDEAU, * * * hereinafter jointly designated as the "LICENSEES",

### WITNESSETH

WHEREAS the Licensors have devised and are now and have been for some time the sole and exclusive owners of an invention which consists of a formula and a processing method for a preparation to be used in the bath which is also a remedy against dry skin and skin irritation, and which invention also consists of a new use for a compound of previously known ingredients; and

WHEREAS the Licensors are now the owners of a patent application covering such invention filed in the United States Patent Office on the 14th day of February, 1955 and which bears Serial Number 488157; and

WHEREAS the Licensors have previously disclosed the formula, its salient features and method of use to the Licensees and have permitted the latter to use and market the same for the purpose of determining the marketability and commercial value thereof; and

WHEREAS the Licensees desire to acquire from the Licensors an exclusive license to manufacture and market the aforementioned invention throughout the United States, its territories and possessions, which invention the Licensees have heretofore marketed under their trade mark "SARDO"; and

WHEREAS the Licensors are desirous of granting to the Licensees such exclusive license upon such terms and conditions as are hereinafter contained;

Now, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. The Licensors hereby grant unto the Licensees and the Licensees hereby accept, the exclusive use, right and license to manufacture and sell preparations embodying, employing and containing the invention or inventions claimed by the Licensors in their application filed in the United States Patent Office on the 14th day of February, 1955 and which bears Serial Number 488157 of said U.S. Patent Office and the inventions claimed by the Licensors under any application or amendment filed or to be filed by the Licensors on any of the said features, arts or improvements of the inventions contained in the aforesaid application, including any reissues or extensions of the foregoing; the Licensors also hereby grant unto the Licensees and the Licensees hereby accept the exclusive right to sublicense the aforementioned rights granted to the Licensees. The aforesaid exclusive rights shall be subject only to the terms, conditions and limitations hereinafter contained.

2. The Licensors hereby covenant and agree that they will diligently prosecute their aforesaid application for letters patent and any amendments filed or to be filed thereto at their own cost and expense; and the Licensees in their discretion hereby agree to assist the Licensors in any proper effort to expedite action on the aforesaid application.

3. The parties hereto shall have the rights granted to them under this agreement for the period commencing June 1, 1955 to the full end of the term or terms for which any letters patent as provided in Paragraph "1" hereof, may be granted, including any reissue or extensions thereof, unless such rights are extended or terminated as may be provided herein.

4. For the rights herein granted to the Licensees by the Licensors, the Licensees agree to pay the Licensors on the terms and conditions hereinafter set forth, the sum of Two Thousand Five Hundred ($2,500.00) Dollars on or before the 31st day of July, 1955. In addition, the Licensees shall pay the Licensors a sum equal to six per cent (6%) of the net selling price of all goods to be sold by the Licensees from and after January 1, 1956.

    \*        \*        \*        \*        \*        \*        \*

6. Notwithstanding the foregoing provisions, in the event that the Licensees sublicense the right to the inventions, or any part of them, covered by this agreement, to a person, firm or corporation other than a subsidiary of the Licensees, the Licensees shall pay to the Licensors fifty per cent (50%) of the net income actually received by the Licensees for such sublicense.

7. Royalties received by the Licensees from a sublicense shall be paid to the Licensors within thirty (30) days after receipt of same but in the amount hereinbefore provided. All other royalties shall be payable by the Licensors to the Licensees quarterly, no later than the thirtieth (30) day of January, April, July

and October or [sic] each and every year for the three (3) month period terminating on the last day of the month next preceding the month in which royalties are to be paid as herein provided.

8. Royalties herein provided to be paid shall be payable by the Licensees one-third (⅓) to each member of the Licensors, or their heirs and assigns and shall be mailed to such address as each member of the Licensors shall advise the Licensees in writing.

9. The Licensees shall render and deliver to the Licensors with each payment of royalties aforementioned, a full and accurate statement in writing of all sales of merchandise made during the preceding quarter, including a record of net income received from sub-licensees herein.

10. Notwithstanding any provision hereinbefore contained, this agreement shall be in full force and effect so long as the Licensees or their successors and assigns shall market a product containing any inventions, features, improvements or uses which are referred to in Paragraph "1" hereof.

It is intended that royalty payments shall be due in such event regardless of whether a patent or patents, are issued to the Licensors and that such payments shall in such event continue beyond the expiration of such patent or patents or reissues thereof.

11. The Licensors agree to disclose to the Licensees and make available for use by the Licensees any improvements or modifications of the invention of the Licensors whether the same be the subject of a patent application or not.

12. Notwithstanding any provision herein contained, the Licensees agree to pay to the Licensors a minimum annual royalty of Six Thousand ($6,000.00) Dollars per annum.

13. The Licensees agree to keep true and correct books of account in which shall be entered all income received by it from sublicensees hereunder and all sales by it or by its subsidiaries, of goods which are subject to the term of this agreement, and such books of account, during all business hours, shall be open to the examination and inspection of the Licensors or their duly authorized representatives.

14. Upon the failure of the Licensees to keep true and accurate books of account, or upon the failure of the Licensees to permit the Licensors, or their duly authorized attorney, to examine and inspect the same, or upon the failure of the Licensees to render and deliver a full and accurate statement in writing of all goods manufactured and sold by it, which contain any inventions or improvements which are hereinbefore referred to, or upon the failure of the Licensees to pay the full amount of license fees herein required to be paid, as and when the same shall become due, then and in any such event, this agreement shall cease and terminate, at the option of the Licensors, by the service of a written notice upon the Licensees, but the Licensees shall not thereby be discharged from any liability to the Licensors for any license fees due at the time of the service of such notice.

The Sardeau partnership produced and sold Sardo bath oil during 1955. It had net sales that year in the amount of $342,244.46. On July 19, 1955, the Sardeau partnership, pursuant to paragraph 4 of the above agreement, paid a total of $2,500 to Emory, Burde, and Weiss, as follows: $833.33 to Emory, $833.34 to Burde, and $833.33 to Weiss.

In December 1955, Emory, Berthe Burde, and Peggy Weiss decided to transfer the assets and business of the Sardeau partnership to the corporation, which had been dormant, in return for stock therein.

Pursuant to a letter dated December 30, 1955, Emory, Berthe Burde, and Peggy Weiss made the following offer to the corporation:

We the undersigned, the owners of the companies known as Sardo by Sardeau [the partnership]; and Sardeau Company [Perfume Co.], hereby make the following offer:

1. We agree to transfer all the assets we own in both of our aforementioned companies to you in consideration of your corporation issuing to the undersigned, or our designees, a total of eighty (80) shares of your capital stock, one-third (⅓) to each of us or our designees.

2. Among our assets, Sardo by Sardeau [the partnership] will assign to you its rights under a licensing agreement for a license to manufacture the product "Sardo" [the bath oil], which agreement is dated May 31, 1955, as well as the trademark "Sardo". We agree to get the consent of the licensors mentioned in that agreement to such assignment.

3. You are to undertake to pay all current debts and obligations of both our aforementioned companies, if you accept this offer, and to abide by our obligations under said licensing agreement.

4. Whenever you accept this offer, it shall be deemed to have been accepted and effective as of January 1, 1956.

The offer to the corporation was accepted at a combined meeting of the stockholders and directors of said corporation, duly held on December 30, 1955, by the following resolution:

RESOLVED: That the Corporation accept the offer of Sardo by Sardeau [the partnership] and Sardeau Company [Perfume Co.] as herein stated before and that the President be and he is hereby authorized to sign the necessary papers to consummate the transaction, and that the Treasurer is hereby authorized to issue eighty (80) shares of stock of the Corporation to the said owners of said companies as provided in said offer, and that the Corporation undertake to pay the debts and obligations of said companies as in said offer provided, and that the transfer of said assets and the delivery of the stock of the Corporation be made on January 2nd, 1956.

Emory, Burde, Weiss, Peggy Weiss, and an individual named Herbert Greenwald were present at that meeting. Each of these individuals also executed a waiver of notice with respect to that meeting.

On January 2, 1956, Emory, Berthe Burde, and Peggy Weiss each received from the corporation 26⅔ shares of its stock. Thereafter the outstanding shares of stock in the corporation were held as follows:

| Shareholder | Number of shares | Percent of outstanding stock |
|---|---|---|
| Berthe Burde | 56⅔ | 28⅓ |
| Peggy Weiss | 56⅔ | 28⅓ |
| Emory | 66⅔ | 33⅓ |
| Herbert Greenwald | 20 | 10 |
| Total | 200 | 100 |

Emory, Berthe Burde, Peggy Weiss, and Herbert Greenwald are not related to each other by blood or marriage.

After January 1, 1956, the corporation conducted the bath oil business formerly carried on by the Sardeau partnership. In so doing,

the corporation assumed the Sardeau partnership's obligations under the agreement of May 31, 1955, to make (royalty) payments to Emory, Burde, and Weiss. The Sardeau partnership ceased to conduct business after December 30, 1955, and filed a final partnership return for 1955.

During 1958, pursuant to the terms of their agreement of May 31, 1955, with the Sardeau partnership (which agreement had been assumed by the corporation), Emory, Burde, and Weiss each received from the corporation royalty payments in the amount of $19,484.33. Burde and Weiss each reported the royalties received by them (less certain expenses attributable thereto) as long-term capital gain.

In his statutory notice of deficiency, respondent asserted that the royalty income received by petitioners from the corporation constitutes ordinary income.

## OPINION

Emory, Burde, and Weiss transferred a bath oil formula, invented by Emory, to a partnership (Sardeau partnership) consisting of Emory, Berthe Burde, and Peggy Weiss in exchange for a royalty. The assets of the Sardeau partnership were subsequently transferred to a corporation (Sardeau, Inc.). We are concerned here with Emory's receipt of royalty income from the corporation in 1958 and the manner in which such amount should properly be taxed.

The facts in the instant case are undisputed and are substantially the same facts as were found in *Max A. Burde*, 43 T.C. 252 (1964), affd. 352 F. 2d 995 (C.A. 2, 1965), certiorari denied 383 U.S. 966 (1966), involving the receipt by Burde and Weiss of royalty income from the corporation in 1958.

The taxpayers in *Burde* reported royalty income which they received from the corporation in 1958 as long-term capital gain on the sale of the "Sardo Patent." The taxpayers based their claim to capital gains treatment primarily on section 1235.[2] Respondent asserted a deficiency, claiming that the amount of the royalty income was includable as ordinary income for the year 1958 under the provisions of section 61.

---

[2] Sec. 1235 provides as follows:

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, * * *

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) RELATED PERSONS.—Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in sec. 267(b)), except brother and sisters, whether by the whole or half blood.

Section 1235 does not apply when the transfer of a patent is between specified related persons,[3] the purpose being to deny favorable capital gains taxation on income derived from a patent when ownership thereof is, in essence, retained by the same economic group. However, the enumeration of related parties in section 267(b) omits any mention of partners and partnerships. Thus, a literal reading of section 1235(d) does not foreclose the benefits of section 1235 for any gain resulting from the identity of the transferor or the individual members of the partnership. Burde and Weiss contended that we should accept this narrow view of sections 1235 and 267(b).

This Court, in upholding the Commissioner in *Burde*, relied primarily on section 1.1235-2(d)(2), Income Tax Regs., which provides that a partnership cannot be the "holder" of a patent, but that the individuals comprising the partnership may qualify as coholders to the extent of their partnership interests. We concluded:

Since the partnership cannot be regarded as the holder of the bath oil invention after the transfer, for purposes of section 1235, we must regard the invention as owned in equal shares by the members of the partnership, namely, Emory, Berthe Burde * * *, and Peggy Weiss * * *. Looking at the transaction from this standpoint, we find that (1) prior to the transfer of the bath oil invention, Emory, Burde, and Weiss each were holders of a one-third interest therein and (2) immediately after the transfer Emory, Berthe [Burde], and Peggy [Weiss] each were owners of a one-third interest in said invention. * * * [43 T.C. at 262]

Hence, we concluded that the transfer to the Sardeau partnership was a transfer between related parties as defined in section 267(b)(1) and that, accordingly, the taxpayers failed to qualify under section 1235. We also held, in the alternative, that capital gains treatment was denied petitioners under section 707(b)(2)(B).

On appeal, the Second Circuit affirmed our holding on other grounds. The majority opinion could not agree with the taxpayers that the failure of section 267(b) to include a partner and partnership within the category of related parties revealed a congressional intent to permit capital gains on any and all transfers of patents to partnerships. It concluded:

the test employed in Section 707 to determine when a partnership may be treated as an entity for purposes of that section is highly relevant and informative, if not controlling, in an analysis of the same question arising under Section 1235. [Footnote omitted. 352 F. 2d at 999-1000.]

Thus, the majority ruled that a transferee partnership under section 1235 should be treated as an aggregate of individual transferees instead of an entity when the transferor and transferee were "related" parties in the manner described in section 707(b)(2)(A) and (B). According to the Second Circuit:

the May 1955 transfer of Sardo falls within the literal terms of Section 707(b) (2)(B)—a transfer between two partnerships 80 per cent owned by the same or related interests. * * * [T]he transferee partnership may not be treated as an entity pursuant to Section 1235(d), and the royalty payments received in 1958 were properly taxable as ordinary income.

[3] Related persons are defined by means of a cross-reference to sec. 267(b).

Via the route of section 707 (b) (2),[4] the Second Circuit, in *Burde*, held that the transfer to the Sardeau partnership, insofar as Burde and Weiss were concerned, was a transfer between husbands and wives— related parties under section 267 (b) (1).

Emory agrees that he is bound by the *Burde* case. However, he asserts that the identical approach taken by this Court and the Second Circuit in *Burde*, with respect to his involvement in the series of transactions, results in entirely different tax consequences. Emory asserts that (1) the transfer to the Sardeau partnership is illusory insofar as he is concerned [5] and (2) he remained a "holder" of a one-third interest in the invention within the meaning of section 1235 (b) after said transfer. Thus, he argues, no taxable event occurred as a result of the transfer to the Sardeau partnership. Emory then contends that the taxable event for him occurred on January 2, 1955, when the Sardeau partnership was incorporated. He argues that since (1) he was a statutory holder of a one-third interest in the bath oil formula after the transfer to the Sardeau partnership and (2) the corporation assumed the obligations under the royalty agreement, he made a transfer of "all substantial rights" in the formula within the scope of section 1235 when the Sardeau partnership incorporated and, accordingly, is entitled to capital gains treatment on royalty income received from the corporation.

Petitioners cite *George N. Soffron*, 35 T.C. 787 (1961), to support their contention that the transfer to Sardeau partnership was illusory and without tax consequences. In that case, four brothers individually owned an equal interest in a patent which they transferred to their own partnership, in which each had equal interests. Petitioners rely on the following language appearing in *Soffron* to justify their interpretation of that case:

When the status of a partner under section 1235 is considered * * *, we find that both before and after the transfer the petitioners were deemed to be "holders" of a one-fourth interest in the patent. * * * [35 T.C. at 789]

---

[4] Sec. 707 (b) (2) provides:

(2) GAINS TREATED AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221—

(A) between a partnership and a partner owning, directly or indirectly, more than 80 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 80 percent of the capital interests or profits interests,

any gain recognized shall be considered as gain from the sale or exchange of property other than a capital asset.

[5] Petitioners reason that since Burde and Weiss were treated as having transferred their interests in the formula to their wives under the aggregate approach taken by this Court and the Second Circuit, it necessarily follows that Emory made a transfer of his interest to himself.

Contrary to petitioners' understanding of *Soffron*, that case did not conclude that the transfer of the patent to the brothers' partnership was illusory and devoid of tax consequences; instead, we simply stated:

We are unable to detect a transfer of "all substantial rights" to the patent [as required by section 1235(a)] by the petitioners inasmuch as the transfer did not effect any substantial change in their positions *insofar as section 1235 is concerned*. We think an examination of all the attendant facts with a view to the economic realities of the transaction definitely establishes that the assignment was a formalistic attempt to come within the purview of section 1235 * * *. Accordingly, it does not qualify under section 1235. [Emphasis supplied. 35 T.C. at 789–790.]

Thus, the decision that section 1235 did not apply was based on the narrow ground that there was no transfer of "all substantial rights" to the patent within the meaning of section 1235(a) and was not based, as petitioners contend, on the ground that the transfer was illusory and devoid of tax consequences. This is borne out by our application in that case of section 707 to the transfer of the patent:

The inability of the [patent] assignment to qualify for the benefits of section 1235 renders section 707 applicable and under that section the amounts realized constitute ordinary income. * * * [35 T.C. at 791]

Section 707(b)(2) is applicable in the event of a sale or exchange. Thus, it is obvious that far from holding the assignment of the patent to the brothers' partnership illusory, we held that the patent assignment constituted a sale or exchange fully taxable under section 707. See also our decision in *Burde*, wherein we stated:

Having decided that Emory, Burde, and Weiss held the bath oil invention as joint venturers prior to their transfer of said invention to the partnership, we, therefore, conclude that section 707(b)(2)(B) governs the transaction. * * * Consequently, the gain realized by Burde and Weiss is to be considered as gain from the sale or exchange of property other than a capital asset. [43 T.C. at 269]

Applying this Court's decision in *Soffron* to the facts of the instant case, we reach a similar result. Before the transfer to the Sardeau partnership, Emory was the owner of an undivided one-third interest in the bath oil formula and, after the transfer, Emory held a one-third interest in a partnership which held the formula. We cannot say, under these facts, that a transfer of "all substantial rights" to the formula was effectuated insofar as Emory is concerned so as to permit the transfer to qualify under section 1235. See *George N. Soffron, supra*. Moreover, section 707(b)(2)(B) is applicable to the case at bar. See *Max A. Burde, supra*. There is no question that under the constructive ownership rules (see sec. 707(b)(3)), the same persons owned, directly or indirectly, more than 80 percent of the capital

interests in both the joint venture and the Sardeau partnership. Section 707(b)(2) requires that any gain recognized as a result of the transaction shall be considered as gain from the sale or exchange of a noncapital asset.

As indicated earlier herein, *Soffron* suggests by way of dicta that the taxpayers therein may not have lost their "holder" status under section 1235 despite the application of section 707 to the assignment of the patent by the brothers to their partnership. If this interpretation is correct, the taxpayers involved in *Soffron* may still have been able to qualify for capital gains treatment under section 1235 in the event of a subsequent transfer by the partnership. We need not pass upon the legal validity of this suggestion here since Emory did not participate in any further transfer of the bath oil formula in which gain would be recognized. Upon the transfer of Sardeau partnership's assets and liabilities to the corporation, Emory, Berthe Burde, and Peggy Weiss merely received stock (80 percent of the corporation's capital stock) for their interests in the partnership assets. Under section 351 [6] no gain is recognized on this type of transaction since no "boot" was received—that is, no property was received from the corporation by the three incorporators other than stock or securities. Neither the corporation's assumption of the Sardeau partnership's obligation to pay royalties to Emory, Burde, and Weiss nor the actual payment of royalties by the corporation constitutes "boot" received by Emory upon the transfer. Emory received his share of the royalty by reason of the *transfer of the bath oil formula to the Sardeau partnership*, and not because of the transfer of Sardeau partnership's assets and liabilities to the corporation. As we held above, the royalty income is taxable under section 707(b) as gain received on the sale or exchange of the bath oil formula to the Sardeau partnership. Since there was no "boot" received by Emory upon the transfer of Sardeau partnership's assets, no gain can be recognized upon his receipt of stock in the corporation. Consequently, in the absence of "boot," neither section 1235 nor section 1231 can have any application in the transfer to the corporation.

For the reasons stated above, any royalty income received by Emory constitutes ordinary income and, therefore,

*Decision will be entered for the respondent.*

---

[6] Sec. 351(a) provides as follows:

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.